*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JAMES MICHAEL FRANKS,

Defendant-Appellant.

UNPUBLISHED
September 26, 2019

No. 341238
Macomb Circuit Court
LC No. 2017-000056-FC

Before: BORRELLO, P.J., and K. F. KELLY and SERVITTO, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of first-degree felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136b(2). The trial court sentenced defendant to life imprisonment without parole for the murder conviction and to 18 to 30 years' imprisonment for the child-abuse conviction. Defendant now appeals as of right. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case arises out of the tragic death of a one-year old child. Defendant was the child's father, and Elizabeth Osborne was the child's mother. At the time of the events at issue, defendant, Osborne, and the child lived together in the same home. Osborne testified that she last saw the minor child alive on the morning of June 23, 2016. That morning, she and defendant changed the child's diaper. Osborne did not notice any bruises or abrasions on the child's face, and she did not notice any bruising on the child's right upper arm, right ankle, or right foot. According to Osborne, the child was happy and interacting normally. Osborne testified that she spent the rest of that day and that night at a friend's house, although she lied to defendant about her whereabouts. The next day, June 24, 2016, Osborne went directly from her friend's house to work. When she finished her shift at work shortly after 6:00 p.m., Osborne called defendant to tell him that she was on her way home and that she was waiting for the bus. Osborne testified that defendant later called her while she was walking home from the bus stop and told her that he had fallen with the child. Osborne further testified that defendant indicated that the child was barely moving and barely breathing. Osborne told defendant to call 911.

-1-

First responders arrived at the home where Osborne, defendant, and the minor child lived after a 911 call had been received reporting that a man and his daughter had fallen down the stairs after the man had a seizure. Firefighter paramedic Kyle Morrow testified that when he arrived at the home, the minor child was "battered and bruised, unconscious, and had irregular respirations." Morrow described severe bruising to the child's face and upper right arm, and he explained that he was concerned about the possibility of a brain injury based on the severe trauma to the child's head and the irregular breathing. The child appeared "limp" and was immediately transported to the hospital by ambulance. Osborne arrived at the house after the child had already been taken to the hospital. According to Osborne, defendant told her that he had been trying to take the child upstairs when he "felt a seizure coming on" and fell down the stairs with the child. Defendant had further explained to her that when he had felt the seizure coming on, he had knelt down with the child, held onto her with both hands, and tried to lean forward so he would not fall backward.

Officer Christopher Skradulis testified that when he arrived at the house that night to take defendant and Osborne to the hospital, defendant told him that he had been taking the child upstairs to put her to bed, holding her in front of him, when he "became faint" and "grabbed onto the railing." According to Skradulis, defendant indicated that this was the last thing he remembered and that he believed that he had suffered a seizure. Skradulis testified that defendant also told him that he fell backwards and woke up with the child wrapped in his arms and next to him. Defendant showed Skradulis the stairway where the fall allegedly occurred and identified the step where he had felt faint, which was approximately halfway up the stairs. Skradulis testified that the stairs were carpeted and that there was tile flooring at the bottom of the stairway. Skradulis subsequently took defendant and Osborne to the emergency department of the hospital.

Dr. Jeffrey Nigl testified that he was working in the emergency room that night and treated the minor child when she arrived. Describing his preliminary observations of the child and her injuries that night, Nigl testified that the child's gaze was deviated with one eye looking up and to the right and the other eye looking straight ahead. Nigl explained that this was a sign of severe neurologic injury. The child also exhibited labored breathing, bruising across the face and forehead, swollen eyelids that were dark purple in color, and a large hematoma "that was lifting the skin away on the left back side of her head." Nigl stated that the hematoma "probably took up the size of a grapefruit on the back of her head" and "looked like it was a bruise that was filling up with blood under the skin and pushing the skin away." Nigl further testified that he observed "posturing," meaning that the child's arms were in a fixed position. According to Nigl, posturing was an indicator of degenerating neurologic status and worsening brain injury. Nigl testified that the child also had bruising on her right arm extending from the upper portion of her arm to her elbow and a large bruise on the front of her right foot. An x-ray taken as part of the initial process of assessing the child's injuries also showed a healing fracture of the left clavicle.

Nigl testified that a CAT scan revealed that the child had multiple skull fractures and that blood was accumulating around her brain and inside her skull. More specifically, there was a fracture running from the rear bottom portion of the skull up to the front near the forehead. The fracture crossed over multiple bones in the child's skull and extended the entire length of the skull. Nigl stated, "So the back portion of her skull [was] cracked in two." Nigl, who also testified as an expert in emergency medicine, opined that this finding was significant because

studies of accidental injuries in children had shown that accidental injuries typically only result in small fractures solely to the parietal bone of the skull rather than fractures crossing multiple bones in the skull. Nigl further testified about the CAT scan image of the child's head as follows:

> There are also some other features about this that make it very concerning. When I saw this image it alarmed me. The widening of the suture—
>
> Pardon me, the widening of the fracture next to the suture[1] indicative of a nonaccidental head injury, meaning that when a patient falls a distance, you typically don't see that configuration where the bone is actually pulled apart. That means that you have fracture underneath. If you have swelling in the brain which is literally forcing the bone apart.
>
> The other thing about this is that you notice that it crosses over multiple suture lines and that is also not in any way typical of an accidental injury, even from a height.

Nigl also indicated that the CAT scan showed a separate suspected "nondisplaced fracture" to the bottom right portion of the skull, which is "a crack in the bone that doesn't completely go through the bone." In contrast, the other skull fracture was a "complex fracture, meaning that it is all the way through the bone and the components are starting to shift relative to one another . . . because [the bone] is not anchored down." Nigl opined that multiple fractures of the skull was "one of the huge red flags for this being nonaccidental trauma."

Next, Nigl testified about the scan of the child's brain:

> The normal anatomy of the brain was disturbing, indicating there is swelling of the brain. The tissue was, when jarred or hit with from an impact, the tissue swells. Again, which is part of the reason I saw the bone starting to pull apart. It's the brain forcing those pieces of bone that are fractured moving away from one another.
>
> There is also a large collection of blood that had collected overlying the brain on the left side that was underneath that fracture line. So there is actually bleeding inside the skull over the brain.

Nigl further explained:

> And one of the most concerning things is when you look at different views of the brain, sliced down by the computer, you actually see the content of one side

---

[1] Nigl explained that suture lines are a normal part of human anatomy and occur where the various bones in the skull meet.

of the brain moving to the other side because of the pressure that the blood exerts on the tissue. It is called midline shift.

The midline is here. The brain tissue is forced in this direction [left to right] because the blood is pushing it that way. That is immediately life threatening.

Nigl testified that based on the severe injuries discovered in the CAT scans, the child was rapidly taken to the operating room in order to drain the blood away from her brain since this represented a potentially life threatening injury. Unfortunately, the child died as this procedure was beginning.

At trial, during the course of describing the child's various injuries, he clarified that the bruises on the child's forehead, eyelids, right side nose and cheek, right arm, and right foot, as well as the child's lip injury, were not caused by the medical treatment the child received that night. Nigl acknowledged that a small red mark under the child's nose could have been caused by surgical tape used in the course of her medical treatment. Marrow also testified that he was not aware of anything that his team would have done in treating the child that would have caused any of her injuries.

Detective James Twardesky testified that he spoke to defendant at the hospital and at the police station that night. According to Twardesky, defendant "didn't seem injured at all." Defendant demonstrated how he had been holding the child. Once, he demonstrated holding the child so the two were face to face. On another occasion, he demonstrated holding the child with the child's head above his own head. Twardesky testified that defendant told him one time that he fell straight back and another time that he tried to run up the stairs when he felt faint and then grabbed the railing before he fell. Defendant told Twardesky that when he woke up after the fall, he was at the bottom of the stairs with his right arm extended and the child lying across it. Twardesky further testified that he investigated the stairway where the fall allegedly occurred and did not find any marks, scuff marks, bumps, indentations or damage of any kind on the drywall covered walls of the stairway and surrounding area, other than marks where a baby gate was situated. Additionally, Officer Sean McKibben testified that he took photographs of defendant that night, which reflected a lack of any apparent injuries other than some type of red rash on his back.

Lisa Gasiewicz, a registered nurse, testified that defendant arrived at the emergency room where she was working and stated that he had recently had a seizure at the top of the stairs. Defendant was complaining about having pain on the right side of his head, directly above his ear. Gasiewicz testified that defendant's vital signs were determined to be within normal limits. She also testified that, in accordance with the standard of care for a patient who has potentially suffered a seizure, various tests were performed on defendant. All of the testing, including CT scan for "any kind of neurological deficit," yielded results within normal limits. Defendant's neurological function was determined to be within normal limits. Gasiewicz also did not detect any lumps, abrasions, lacerations, bruises, or masses where defendant reported that his head hurt, and none were noted on the rest of his body. When defendant was discharged that day, he was diagnosed with acute syncope. Gasiewicz explained that this is a generally diagnosis meaning that a person fainted or passed out for an unknown reason.

-4-

Dr. Leigh Hlavaty, the deputy chief medical examiner in Wayne County who performed the autopsy, provided further testimony about the extent of the minor child's injuries and also testified as an expert in anatomic pathology and forensic pathology. Hlavaty testified that she identified bruises to the child's right cheek, right lower lip, right upper arm, both forearms, left scalp in front of and behind her ear, right upper back, top right foot, front of the right ankle, both sides of her forehead, both upper eyelids, and both sides of her nose. Hlavaty also noted an abrasion on the child's right temple. The bruise behind the child's left ear was "very large," being "at least a few inches by a few inches." Hlavaty indicated that there were approximately nine different injuries to the front of the child's face. The bruise on the front and outer portion of the child's right arm was four inches by two inches. Hlavaty testified that the three faint bruises on the child's upper back "being smaller and more round or oval [were] more consistent with her shoulder being grabbed at some point and this being fingertip bruises as opposed to a large fist or palm striking her upper back." According to Hlavaty, the bruise on the child's foot was "consistent with a large flat or broad object striking her foot or if her foot was being grabbed it could result in bruising on the entire front of the foot."

Hlavaty's internal examination revealed areas of bleeding under virtually the entire scalp. Hlavaty testified that the child's emergency room records indicated that the child had two separate scalp hematomas in front of and behind her left ear. She explained that these hematomas would have been underneath the large bruises but that the bleeding had spread underneath the entirety of the scalp by the time of the autopsy.

Hlavaty's internal examination also revealed two skull fractures originating from the left occipital bone in the back of the skull. The first of these fractures was approximately 6 inches in length, started in the left back of the head underneath the large bruise, extended through the back of the skull onto the top of the head, and finally ended near the top of the left side of the forehead. Hlavaty testified that this fracture was a displaced fracture with one edge pushed down lower than the other edge and that such a displacement can be caused by a force being applied unevenly with greater force to one side or by the head striking an object with an edge. The second fracture also started in the left occipital bone about half an inch from the first fracture. However, it extended through the base of the skull, through the right occipital bone and into the right temporal bone in the base of the skull before terminating approximately in line with the right ear. This fracture was also six inches long. Finally, Hlavaty also found subdural and subarachnoid bleeding on the surface of the brain and bruising to the brain itself. These injuries were located on the left and left back of the brain, underneath the location of the two skull fractures. Hlavaty opined that the bruise on the left back of the head and the bruise on the left side of the head were caused by different impacts but that the two fractures could have resulted from either a single impact to the left back of the head or two separate impacts. Hlavaty also opined that there "were at least three impact[s] to[] [the child's] head, to her face, her forehead, to the left side and the left back of her head."

Regarding the large bruise on the child's right arm, Hlavaty testified that she discovered a deep subcutaneous hemorrhage[2] underneath the injury that extended down to the bone and wrapped around the outside of the arm from front to back. There was only a thin area on the inner arm that was not injured. Hlavaty opined that this injury was caused by a force that "almost entirely encircled her upper arm" and that the complete injury could not be explained by the child's arm being slammed into something like a door or door jamb. She further testified that it was "an injury we typically see when a child's arm is forcibly grabbed." Additionally, Hlavaty found subcutaneous hemorrhages on the back of the left forearm, the right upper back, and the right lower back. She also found bruising on the back surface of both lungs.

According to Hlavaty, all of the above injuries were "fresh or acute."[3] However, she also discovered that the child had a fracture to the inner third of her left clavicle that was in the process of healing. Based on the bone's stage of healing, Hlavaty determined that the fracture was approximately 4 weeks old. Hlavaty testified that such a fracture to this portion of the clavicle was very rare in children of any age and that it is typically only seen in one-year-old children in three situations: child abuse, cancer of the bone, and metabolic bone disease. Hlavaty stated that the autopsy excluded the presence of cancer and metabolic bone disease. Hlavaty opined that such a fracture can be caused by forcing the arm back and twisting up. Hlavaty testified that a one-year-old child could not fracture the inner third of the child's clavicle by accident and that an accidentally caused clavicle injury in a child that young would occur in a different portion of the clavicle. Nonetheless, Hlavaty indicated that she could not actually know how the injury occurred or who caused it.

Hlavaty also was unable to locate any medical records indicating that treatment had been sought for the child's clavicle injury. According to Hlavaty, the child's clavicle injury would have been noticeable to a caretaker because the bump from the healing process would have been visible through the child's skin, although a person without medical training might not know that it was a clavicle injury.

Hlavaty concluded that the cause of the child's death was blunt force trauma to the head and that the manner of death was homicide. Hlavaty opined that the alleged fall down the stairs could not explain all of the recent injuries that the child had incurred. She explained:

> While the internal fractures and the bleeding were consistent with an impact to the left back of her head, which could have been caused by her hitting the tile floor. [Sic.] There were still multiple impacts that were not explained. The one to the left side of her head that resulted in the bruising and the hematoma, the bruising to

---

[2] Hlavaty explained that a subcutaneous hemorrhage is one that is present in the tissue underneath the skin, including the muscle.

[3] Hlavaty testified that while there is no way to determine the age of a bruise with precision, it is still possible to tell from the color of the bruise whether it occurred recently or is starting to heal. Hlavaty opined that none of the child's external injuries showed signs of healing and that they were therefore recent.

her face, the wrap around bruise on her right upper arm. All of these bruisings that were present on her right leg. All of those are injuries that cannot be explained by the fall no matter how we could envision it.

Hlavaty testified that it was not easier to fracture a child's skull than an adult's skull because children's bones have a higher water content and are more flexible than the bones of adults. She opined that children "can withstand injury that would otherwise cause injuries in an adult."

Defendant presented the testimony of David Jamison, a mechanical engineer and biomedical engineer who was qualified as an expert in biomechanics and biomedicine. Jamison testified that he attempted to determine whether the child could have suffered multiple impacts and incurred the multiple injuries present on the child from the type of fall described by defendant. According to Jamison, defendant would have swung into the wall when he grabbed the railing and the child would have swung with him since he was holding the child. Based on how defendant claimed to have been holding the child, she could have hit the left side of her head and left elbow on the wall during this part of the fall. Jamison testified that while this analysis would explain the location of the child's injuries to the left side of her head and left elbow, he could not determine the severity of the impact and whether it would have caused enough stress to fracture the bone because he did not have enough information to make this calculation. Jamison stated that after hitting the wall, defendant and the child would have continued to fall down the stairs with the back right side of the child's head eventually striking the floor. Jamison also could not determine the amount of force with which the child's head would have hit the floor. Jamison further opined that the child's right arm bruising could have been caused by defendant grabbing and holding onto the child as he fell. Jamison could not explain the additional bruising to the child's face by reference to the alleged stairway fall, but indicated that he concluded this bruising was caused by medical personnel by relying on the preliminary examination testimony of Hlavaty indicating that certain bruising was consistent with handling by medical personnel.

Defendant was convicted as previously noted. This appeal ensued.

## II. EXPERT OPINIONS ON "CHILD ABUSE"

Defendant first argues that he was denied a fair trial because the prosecution's three expert witnesses—Nigl, Hlavaty, and Dr. Marcus DeGraw[4]—invaded the province of the jury when they each were permitted to improperly testify that the minor child's injuries were the result of child abuse, thus rendering an expert opinion on defendant's intent as well as his guilt.

### A. ISSUE PRESERVATION AND STANDARD OF REVIEW

---

[4] DeGraw testified as an expert in general pediatrics and child abuse pediatrics.

Defendant did not object in the trial court to any of the testimony he now challenges on appeal, and we therefore review this unpreserved claim of error for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 761-764; 597 NW2d 130 (1999).

> To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice. Finally, once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*Id*. at 763-764 (quotation marks and citations omitted; alteration in original).]

## B. ANALYSIS

Defendant is correct in his factual assertion that Nigl, Hlavaty, and McGraw each opined at various points in their testimony that there were indications that the minor child's injuries were caused by child abuse.

With respect to Nigl, he opined at several points during his testimony that the child's injuries were indicative of "abuse." However, considering Nigl's testimony in its totality, the clear focus of his testimony was on explaining the severity of the child's injuries that he observed while treating her at the hospital and, particularly, the serious nature of her head and brain injuries.

Furthermore, Nigl opined on multiple occasions during his testimony that injuries of this nature were not consistent with an accidental fall from a height. In doing so, Nigl explained his reasons for reaching that conclusion, including that there was a fracture that crossed over multiple bones in the skull rather than being confined solely to the parietal bone as was typical in injuries caused by accidental falls, that this particular fracture was a complex fracture, that this fracture was "widening," that there also were multiple skull fractures, and that there was an associated brain injury. Nigl testified that it was rare for brain injuries to occur with skull fractures caused by accidental falls and that this "type of injury is much more consistent with the force that I would see in a motor vehicle collision." Nigl stated, "That level of force is not seen in accidental trauma." Nigl opined that considering the combination of these observed injuries permitted a more confident conclusion that they were nonaccidental. Nigl also testified about the life threatening nature of the child's brain injuries that were discovered upon her admission to the hospital. Finally, Nigl opined that defendant's explanation for how the injuries occurred was "very sparse" compared to the amount of information he typically received when treating an injured child.

On cross-examination, defense counsel elicited testimony from Nigl admitting that he did not have any information about how the impact actually occurred, that he did not have any

-8-

training in engineering, and that he was not describing the manner of the fall through application of engineering principles.

Turning to the testimony of Hlavaty, she concluded that the manner of death was homicide. Hlavaty explained to the jury that the medical examiner's definition of homicide is that the death was caused by another person. She also opined that the older clavicle injury was "suspicious for child abuse"[5] and that inconsistencies in defendant's explanations indicated that there was "child abuse going on." However, Hlavaty further explained and clarified:

> *A*. But with regard to trying to ascertain if this could have been a stairwell fall, because there were inconsistency [sic] and not a whole lot of information present, we had to try and envision this from happening from every single step and from striking any and all of the walls or surfaces in order to try and eliminate the stairway as the way that she got her injuries.
>
> *Q*. So you actually were trying to make all of those injuries that you observed fit the scenario given?
>
> *A*. Yes
>
> *Q*. And were you able to do that?
>
> *A*. No. While the internal fractures and the bleeding were consistent with an impact to the left back of her head, which could have been caused by her hitting the tile floor. There were still multiple impacts that were not explained. The one to the left side of her head that resulted in the bruising and the hematoma, the bruising to her face, the wrap around bruise on her right upper arm. All of these bruisings that were present on her right leg. All of those are injuries that cannot be explained by the fall no matter how we could envision it.

On cross-examination, Hlavaty confirmed that she did not make any determination on intent or whether the injuries were intentionally caused to the victim. She also testified that she could not determine how the object causing the blunt force trauma came into contact with the child. Hlavaty indicated that she did not use any mathematical calculations or engineering principles in her analysis. Defense counsel also elicited testimony from Hlavaty that the child's skull fracture and bleeding on her brain could be explained by a fall down the stairs if the left back of the child's head hit the tile floor. However, Hlavaty explained that even if the child's head bounced, that would not explain the other impact sites such as the one on the left side of the head. She also opined that the type of the injuries to the left side of the child's head could not be explained by an impact with the wall.

---

[5] Hlavaty also testified that when fractures to the inner third of the clavicle are observed in a one-year-old child, "assuming that you can rule out the child has cancer or metabolic bone disease, then the cause is child abuse."

DeGraw, the prosecution's third expert witness, testified that the combination of the older clavicle injury and the newer multiple blunt force injuries to the child's head and other areas, along with no adequate explanation for how the injuries occurred, was "highly concerning for child abuse." DeGraw also testified that the nature of the child's injuries and the presence of injuries from multiple impact points was not consistent with the explanation that was offered by defendant. DeGraw further explained that under a scenario like the one defendant described, he would expect that the adult also would have suffered a significant head injury. As with the other two experts, defense counsel elicited testimony from DeGraw on cross-examination indicating that he did not have any engineering training and did not apply engineering principles in his analysis. DeGraw also admitted that the child's clavicle injury might not have been evident to her parents and that he could not rule out the possibility that such an injury was caused by accident.

The testimony of the prosecution's three experts was plainly erroneous to the extent that each opined that there were indications of child abuse. While a medical expert testifying in a case of alleged child abuse may permissibly offer an opinion that the evidence shows that the child's injuries were inflicted and not accidental, the expert may not opine that the inflicted trauma constituted "child abuse" and may not offer an opinion on the accused's intent or guilt. *People v McFarlane*, 325 Mich App 507, 522-523; 926 NW2d 339 (2018).[6] This Court explained in *McFarlane*:

> Notwithstanding the propriety of a diagnosis of inflicted trauma, we conclude that in cases involving allegations of abuse, an expert goes too far when he or she diagnoses the injury as "abusive head trauma" or opines that the

---

[6] Defendant on appeal seems to also equate an expert's opinion that the child's injuries were nonaccidental with an opinion that child abuse occurred, arguing that the former is just as improper as the latter. Thus, defendant maintains that it was error for the prosecution's experts to offer both of these opinions. Defendant is incorrect. There is a distinction, albeit a somewhat subtle one, between these two types of expert opinions:

> [A] physician may properly offer an opinion that, when the medical evidence is considered along with the child's history, the child's injuries were inflicted rather than caused by accident or disease because a jury is unlikely to be able to assess the medical evidence. Expressing an opinion that the trauma was inflicted or not accidental does not impermissibly invade the province of the jury because the expert is not expressing an opinion regarding the defendant's guilt or whether the defendant had a culpable state of mind, which the expert may not do. Instead, the expert is interpreting the medical evidence and offering the opinion that the trauma was caused by human agency, and the jury is free to reject that opinion on the basis of the evidence adduced at trial, including a contrary opinion by another expert. [*McFarlane*, 325 Mich App at 522-523 (citations omitted).]

Therefore, it was not erroneous for the prosecution's experts to opine about whether the child's injuries were inconsistent with having been caused by an accidental fall down the stairs.

inflicted trauma amounted to child abuse. The ordinary understanding of the term "abuse"—as opposed to neglect or carelessness—implies a level of willfulness and moral culpability that implicates the defendant's intent or knowledge when performing the act that caused the head trauma. An expert may not offer an opinion on the intent or criminal responsibility of the accused. [*Id*. at 523.]

Furthermore, contrary to the State's erroneous assertions on appeal, this legal principle is not a new one. It is well established that an expert may not "render a legal conclusion regarding whether abuse in fact occurred." *People v Beckley*, 434 Mich 691, 729; 456 NW2d 391 (1990) (opinion by BRICKLEY, J.). "The conclusion whether abuse occurred is outside the scope of expertise, and therefore not a proper subject for expert testimony. The jury must make its own determination from the totality of the evidence whether the complainant was . . . abused." *Id*. See also *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857 (1995), amended 450 Mich 1212 (1995) (reaffirming the holding in *Beckley* "that (1) an expert may not testify that the sexual abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty").[7] It almost goes without saying that in a case such as the instant one involving charges of child abuse, an expert's opinion that the victim's injuries were the product of child abuse constitutes a legal conclusion improperly couched as an expert opinion. Therefore, the expert testimony opining about indications of child abuse was improper and constituted plain error.

Nonetheless, defendant has not demonstrated that reversal is required because we are convinced from our review of the record that these errors did not affect the outcome of the proceedings. See *Carines*, 460 Mich at 763.

First, defendant's theory of accident was supported at trial by the presentation of expert testimony from a biomedical engineer to explain how the child could have incurred her various injuries during the type of fall described by defendant. Defense counsel also conducted thorough and effective cross-examination of the prosecution's experts that was directed at showing their respective lack of knowledge about the mathematical and engineering principles that could explain how certain injuries are incurred. This cross-examination paved the way for the defense expert in biomechanics and biomedicine to explain how the fall described by defendant could account for the child's injuries. Defense counsel also obtained concessions from the prosecutor's experts on cross-examination regarding the limitations of their opinions, specifically including the inability to make any determinations related to how the injuries actually occurred or the intent with which any injury could have been inflicted. Defense counsel thus effectively rebutted the improper implications of the prosecution experts' references to child abuse by conducting thorough cross-examination and presenting a defense expert supporting defendant's accident theory.

---

[7] Although both *Beckley* and *Peterson* involved the context of child sexual abuse, there is no appreciable difference between prohibiting an expert from opining in the form of a legal conclusion that "child sexual abuse" actually occurred and prohibiting an expert from opining in the form of a legal conclusion that "child abuse" actually occurred.

Furthermore, all three prosecution experts testified that the nature of the child's injuries was inconsistent with being caused by an accident or the type of accidental stairway fall described by defendant. Each provided their reasons for their respective conclusion; they noted the location and severity of the various injuries, as well as the presence of multiple injuries from distinct impacts. The testimony about the extreme severity of the child's injuries was compelling. So was testimony by the experts that injuries of that nature were unlikely to have been caused by an accident, and that the type of fall described by defendant could not account for all of the child's various injuries. There was evidence that the child's fatal injuries were incurred between the time that Osborne left the home on June 23 and when first responders arrived at the home on the evening of June 24. The child was solely in the care of defendant at this time. Accordingly, we do not believe that the references to child abuse would have been information that affected the jury's deliberations and ultimate decision when considered in light of the overwhelming evidence of defendant's guilt and defense counsel's effective mitigation of any inappropriate prejudice that might otherwise have been caused by such improper testimony. Defendant has therefore failed to demonstrate plain error requiring reversal.

In the alternative, defendant argues that defense counsel was ineffective for failing to object to the improper expert opinion testimony regarding indications of "child abuse."

A claim of ineffective assistance of counsel presents a mixed question of fact and constitutional law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). We review a court's factual findings for clear error and questions of law de novo. *Id*. Although defendant preserved this issue by moving this Court to remand for purposes of an evidentiary hearing regarding this ineffective assistance of counsel claim, see *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000), we denied defendant's motion.[8] Because no evidentiary hearing was held, our review is limited to the appellate record. *Id*. at 659.

"[E]stablishing ineffective assistance requires a defendant to show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018), citing *Strickland v Washington*, 466 US 668, 688; 104 S Ct 205280; L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 338; 521 NW2d 797 (1994). Counsel performs deficiently if counsel's representation was below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 US at 688-689. "Prejudice means 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Randolph*, 502 Mich at 9, quoting *Strickland*, 466 US at 694.

Although defense counsel in this case clearly operated throughout the trial in pursuit of a trial strategy aimed at showing that the injuries were the result of an accidental fall, it does not seem that objecting to the prosecution's experts' opinions that child abuse occurred would have been inconsistent with that strategy. As previously discussed, the impropriety of such testimony

---

[8] *People v Franks*, unpublished order of the Court of Appeals, entered April 17, 2019 (Docket No. 341238).

is well-established. It does not appear that there was any legitimate strategic reason for failing to object to this improper testimony under the circumstances of this case,[9] and defense counsel performed deficiently in this regard. *Strickland*, 466 US at 688-689.

However, the same considerations that led us to conclude that defendant failed to meet the prejudice prong of the plain-error test also lead us to conclude that defendant has failed to show that but for defense counsel's failure to object to this evidence, there is a reasonable probability that the outcome would have been different. *Randolph*, 502 Mich at 9. Because defendant has not shown the requisite prejudice in this context, defendant has also not demonstrated that he received ineffective assistance of counsel. *Strickland*, 466 US at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.").

### III. EVIDENCE OF THE HEALING CLAVICLE FRACTURE

Next, defendant challenges the trial court's decision to allow the prosecution to introduce Hlavaty's testimony about the child's four-week-old healing clavicle fracture. Defendant argues that there was no evidence showing that defendant caused the child's older clavicle injury and that Hlavaty's testimony about the clavicle injury was improper prior bad acts evidence that was inadmissible under both MRE 404(b)[10] and MCL 768.27b.[11]

### A. ISSUE PRESERVATION AND STANDARD OF REVIEW

Defendant preserved[12] this issue through a pretrial motion opposing the prosecution's notice of its intent to introduce other-acts evidence under MRE 404(b) and MCL 768.27b; the trial court denied defendant's motion with respect to Hlavaty's testimony.

---

[9] We acknowledge that under some circumstances, there may be reasonable strategic reasons for deciding not to object to an obvious error and that counsel's performance would not be deficient in such a scenario. See *Randolph*, 502 Mich at 12. However, there does not appear from the record to have been a reasonable strategic reason for the decision not to object to the improper expert opinion testimony regarding indications of child abuse in the instant case. Regardless, as explained in the body of this opinion, we also conclude that the performance of defense counsel did not result in prejudice for purpose of the ineffective assistance of counsel test.

[10] The recent amendment to MRE 404(b)(2) is not implicated in this appeal.

[11] This statute has been amended since defendant's trial. These amendments, which make provisions for other acts of sexual assault in sexual assault cases, have no bearing on any of the issues raised in this case. See 2018 PA 372. Accordingly, we simply quote from the analytically pertinent portions of the current version of the statute in this opinion because this language has not changed.

[12] "In order to preserve the issue of the improper admission of evidence for appeal, a party generally must object at the time of admission." *People v Knox*, 469 Mich 502, 508; 674 NW2d 366 (2004).

"Preserved evidentiary rulings are reviewed for an abuse of discretion." *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Id*. at 217. However, our review is de novo if the trial court's decision involves a preliminary question of law, such as whether admission is precluded by a rule of evidence. *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010).

## B. ANALYSIS

As an initial matter, it is apparent from the trial court's written opinion and order in which it announced its ruling on the admissibility of this testimony that the trial court did not rely on MCL 768.27b as authority for permitting the prosecution to introduce Hlavaty's testimony about the healing clavicle injury. This statute provides in pertinent part that "in a criminal action in which the defendant is accused of an offense involving domestic violence[,] . . . evidence of the defendant's commission of other acts of domestic violence . . . is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403." MCL 768.27b(1). In this case, the prosecution sought to introduce Hlavaty's testimony about the existence of the clavicle injury and how such an injury could be incurred, but there was no assertion in the pretrial proceedings that Hlavaty would somehow be able to testify that defendant caused this injury. Therefore, this proposed testimony did not involve "evidence of the defendant's commission of other acts of domestic violence" that could be deemed admissible under MCL 768.27b(1). The trial court's opinion and order does not mention the proposed testimony of Hlavaty in the section involving application of MCL 768.27b. Because there is no decision by the trial court on this particular issue for us to review, we need not address this particular part of defendant's appellate argument further. "Generally, appellate review is limited to issues the trial court decided." *People v Herrick*, 277 Mich App 255, 259; 744 NW2d 370 (2007).

Next, to the extent that the trial court relied on MRE 404(b) as a ground for admitting Hlavaty's testimony about the clavicle injury, it erred. MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Our Supreme Court has held that the following four-part test applies to evaluating the admissibility of other-acts evidence under MRE 404(b):

> First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting

instruction to the jury. [*People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).]

In the context of MRE 404(b)(1), this Court has stated that evidence of the existence of a particular fracture or injury suffered by an alleged child-abuse victim fails to satisfy the relevancy requirement "[i]n the absence of evidence connecting the fracture to defendant." *McFarlane*, 325 Mich App at 528-530. In this case, as the prosecution admitted during the hearing on this motion and as was borne out by Hlavaty's actual testimony at trial, Hlavaty could not determine exactly how the clavicle injury was incurred and could not state that defendant (or any other particular individual for that matter) inflicted it. Although Hlavaty was able to testify about the nature of the injury and that injuries of this type in a one-year-old child are unlikely to have been caused by accident because of the precise location of the injury, there was no evidence that defendant inflicted the clavicle injury.[13] Therefore, this evidence was not admissible under MRE 404(b)(1). *McFarlane*, 325 Mich App at 530.

However, in its ruling on the admissibility of this evidence, the trial court also cited an unpublished opinion of this Court[14] that relied on Michigan Supreme Court precedent stating that "evidence underlying the basis of an expert opinion" is generally admissible subject to the relevancy requirement and MRE 403, *Pickens*, 446 Mich at 334-336, citing MRE 703 and MRE 705, and that "signs of past physical abuse of [a] child [are] relevant to prove that his subsequent fatal injuries were not inflicted accidentally," *People v Knox*, 469 Mich 502, 513; 674 NW2d 366 (2004). The *Pickens* Court reasoned that evidence underlying the basis for an expert's opinion "is relevant because it places the expert's opinions into a factual context, thereby enabling the trier of fact to determine the weight due an expert's opinion." *Pickens*, 446 Mich at 335.

In this case, the prosecution also argued at the hearing that the proposed testimony of Hlavaty about the clavicle injury was admissible under MRE 702 and MRE 703 because it formed part of the basis for Hlavaty's opinion that the manner of death was homicide. Hlavaty testified at trial consistently with this assertion.

MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the

---

[13] Although Osborne testified that she worked 35 to 40 hours a week and that defendant watched the child while she as at work, Osborne also testified that defendant was not the only person who took care of the child.

[14] *People v Threats*, unpublished per curiam opinion of the Court of Appeals, issued December 10, 2015 (Docket No. 323097).

product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence. This rule does not restrict the discretion of the court to receive expert opinion testimony subject to the condition that the factual bases of the opinion be admitted in evidence hereafter.

MRE 705 provides:

The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

In this case, Hlavaty's testimony about the clavicle injury and the unlikelihood that it was caused by accident was relevant for the narrow purposes of evaluating her conclusion that the manner of the child's death was homicide, *Pickens*, 446 Mich at 335, and showing that the child's subsequently incurred fatal injuries were not the result of accident, *Knox*, 469 Mich at 513. Hlavaty testified that she discovered this injury during the course of the autopsy she performed on the child and that her opinion that the manner of death was homicide was based in part on her conclusions about the nature of this particular injury, in addition to her conclusions about the child's more recent injuries. "The facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence." MRE 703. The relevancy of this particular evidence was heightened in this case by defendant's claimed defense of accident, which gave Hlavaty's opinion that the manner of death was homicide—as opposed to accident— even greater significance. See MRE 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

Turning to MRE 403, this rule states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Rule 403 does not prohibit prejudicial evidence; only evidence that is unfairly so." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998). "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *Id*. Unfair prejudice refers to a situation where (1) "a probability exists that evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect," and (2) "it would be inequitable to allow the proponent of the evidence to use it." *People v Mills*, 450 Mich 61, 75-76; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995) (quotation marks and citation omitted).

In this case, the evidence of the clavicle fracture was probative for showing that the child's recent injuries were inflicted by someone because the presence of a prior nonaccidentally

incurred injury made it more likely that the subsequent, recent injuries were also not the result of an accident. Thus, the evidence was probative for allowing the jury to evaluate the weight to give to Hlavaty's opinion that the manner of death was homicide, i.e., that the death was caused by another person. The clavicle injury evidence, if limited to its proper purposes as described above, would not be *unfairly* prejudicial; Hlavaty did not purport to claim that defendant caused the prior clavicle injury, and there was no evidence connecting defendant to the infliction of that injury. The clavicle injury merely constituted one of the many autopsy findings that informed Hlavaty's opinion and which she admittedly could not attribute to being caused by any particular individual. Such a presentation of this evidence does not present a risk that jurors would weigh the evidence "substantially out of proportion to its logically damaging effect." *Id.* at 75 (quotation marks and citation omitted). Accordingly, the trial court articulated a proper basis in its pretrial ruling for admitting this evidence.

However, the crux of defendant's appellate argument seems to actually be that this evidence nonetheless became unfairly prejudicial as a result of the prosecutor's improper use of the admitted clavicle injury evidence at trial. Defendant maintains that the prosecutor used the clavicle evidence as improper prior bad acts evidence, citing the prosecutor's closing arguments that the clavicle injury was evidence of child abuse and that defendant was the individual who caused the injury by inflicting this abuse on the child. It is improper for a prosecutor to use evidence that there were signs of past physical abuse to the child "to convince the jury that defendant had caused those prior injuries, despite the absence of any evidence that defendant had committed the past abuse." *Knox*, 469 Mich at 513. Our Supreme Court has explained that

> [e]vidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury. In the context of prior bad acts, that danger is prevalent. When a juror learns that a defendant has previously committed the same crime as that for which he is on trial, the risk is severe that the juror will use the evidence precisely for the purpose that it may not be considered, that is, as suggesting that the defendant is a bad person, a convicted criminal, and that if he "did it before he probably did it again." [*Crawford*, 458 Mich at 398 (citation omitted).]

In ruling the clavicle injury evidence admissible, the trial court expressly stated that defendant could request an appropriate limiting instruction to the effect that there was no evidence that the prior clavicle injury was caused by a criminal act or, if it was inflicted by a criminal act, who committed it. It does not appear that such an instruction was given, although the trial court did instruct the jury that it "must not convict the Defendant here solely because you think he is guilty of other bad conduct" and that the "evidence must convince you beyond a reasonable doubt that the Defendant committed the alleged crime or you must find him not guilty."[15] Thus, the trial court's pretrial ruling cannot be understood to have sanctioned the use

---

[15] The trial court also instructed the jury as follows:

> The prosecution has introduced evidence of claimed acts of domestic violence by the Defendant, for which he is not on trial. Before you may consider

of the clavicle evidence for all of the purposes subsequently argued by the prosecutor at trial, namely that defendant caused the clavicle injury.

Understood in this light, defendant's appellate argument essentially amounts to a claim of prosecutorial misconduct premised on the prosecutor's improper expansion of the purpose for which the clavicle evidence could permissibly be used. Defendant did not object at trial to the statements now challenged on appeal. "Review of alleged prosecutorial misconduct is precluded unless the defendant timely and specifically objects, except when an objection could not have cured the error, or a failure to review the issue would result in a miscarriage of justice." *Unger*, 278 Mich App at 234-235 (quotation marks and citation omitted). A defendant's failure to contemporaneously object and request curative instructions at the trial court level in response to allegedly improper prosecutorial statements results in plain error review on appeal. *Id*. at 235. "[W]e cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Id*. (quotation marks and citation omitted).

In this case, as previously discussed, the clavicle injury evidence was not admissible as other-acts evidence under MRE 404(b)(1) because there was no evidence linking defendant as the cause of this prior injury, even though the clavicle injury evidence was admissible as part of the underlying basis for Hlavaty's expert opinion.[16] Thus, it was error for the prosecutor to attempt to use the clavicle injury evidence for an improper, inadmissible purpose after the trial court had ruled the evidence admissible for a different, more limited purpose. However, had defendant timely objected, a suitable curative instruction could have been given instructing the jury to only consider the evidence for its narrow, proper purpose. This would have cured the impropriety. Accordingly, defendant has not shown error requiring reversal on this ground. *Unger*, 278 Mich App at 235. "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions." *Id*. (citation omitted).

---

such alleged acts as evidence against the Defendant, you must find that the Defendant actually committed such act.

If you find that the Defendant did commit those acts, you may consider them in deciding if the Defendant committed the offenses for which he is now on trial.

By arguing during closing that defendant caused the prior clavicle injury, the prosecutor essentially characterized the prior clavicle injury evidence as evidence of prior acts of domestic violence, see MCL 768.27b(6)(a)(*i*), although without any evidence that defendant committed an act causing the clavicle injury. A prosecutor may argue reasonable inferences from the evidence but "may not argue facts not in evidence or mischaracterize the evidence presented." *People v Watson*, 245 Mich App 572, 588; 629 NW2d 411 (2001).

[16] Evidence may be admissible for one purpose but not admissible for another purpose. MRE 105.

## IV.  EVIDENCE OF UNCHARGED INSTANCES OF DOMESTIC VIOLENCE

Next, defendant argues that the trial court erred by admitting evidence that defendant previously committed acts of domestic violence against Osborne that were never reported and for which he was never charged with a crime.  This evidence was presented at trial through the testimony of Osborne and one of Osborne's coworkers.  Osborne testified that defendant had slapped her "a few times," that she did not remember many of these physical assaults because she had "blocked them out," and that there had been "at least over 50" physically abusive incidents during their four-year relationship.  She reported that she had bruising on her neck from an incident where defendant hit her and held her down on the bed around the neck, as well as bruises on her face from another incident.  She had told a coworker of the violence.  The coworker testified that she had picked Osborne up from home after a fight with defendant; the coworker observed bruises on Osborne's neck and eye, and she reported that Osborne was crying, shaking, and distraught.

## A.  ISSUE PRESERVATION AND STANDARD OF REVIEW

The admissibility of this evidence was addressed in the same motions and trial court opinion and order discussed above with respect to the clavicle injury evidence.  Defendant preserved his appellate challenge through his pretrial motion opposing the admission of this evidence,[17] which the trial court denied; the court ruled that the evidence of prior incidents of domestic violence was admissible under both MCL 768.27b and MRE 404(b).  We review preserved evidentiary issues for an abuse of discretion, *Unger*, 278 Mich App at 216, but preliminary questions of law are reviewed de novo, *Mardlin*, 487 Mich at 614.

## B.  ANALYSIS

As previously noted, the trial court determined that this evidence was admissible under both MCL 768.27b and MRE 404(b).  MCL 768.27b provides in pertinent part as follows:

> (1) . . . in a criminal action in which the defendant is accused of an offense involving domestic violence[,] . . . evidence of the defendant's commission of other acts of domestic violence . . . is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.

> *  *  *

> (6) As used in this section:

> (a) "Domestic violence" or "offense involving domestic violence" means an occurrence of 1 or more of the following acts by a person that is not an act of self-defense:

---

[17] *Knox*, 469 Mich at 508.

(*i*) Causing or attempting to cause physical or mental harm to a family or household member.

(*ii*) Placing a family or household member in fear of physical or mental harm.

* * *

(*iv*) Engaging in activity toward a family or household member that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

(b) "Family or household member" means any of the following:

(*i*) A spouse or former spouse.

(*ii*) An individual with whom the person resides or has resided.

(*iii*) An individual with whom the person has or has had a child in common.

(*iv*) An individual with whom the person has or has had a dating relationship. As used in this subparagraph, "dating relationship" means frequent, intimate associations primarily characterized by the expectation of affectional involvement. This term does not include a casual relationship or an ordinary fraternization between 2 individuals in a business or social context.

On appeal, defendant has not explained why he believes this evidence was not admissible under MCL 768.27b, and he has not provided any substantive analysis on this issue. Instead, defendant focuses on MRE 404(b) and argues that the evidence was improper propensity evidence. Therefore, defendant has abandoned any challenge to the trial court's decision to admit the evidence under MCL 768.27b. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

Moreover, to the extent that defendant appears to argue that the evidence of previous domestic violence was nonetheless inadmissible because it was not relevant, MRE 402, or because its probative value was substantially outweighed by a risk of unfair prejudice, MRE 403, defendant has not shown that the trial court abused its discretion.

MRE 402 states in pertinent part that "[e]vidence which is not relevant is not admissible." "Relevant evidence" is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. MRE 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence." These rules of evidence are also expressly incorporated within the language of MCL 768.27b(1), quoted above.

Turning to defendant's arguments, the fundamental premise of defendant's general argument against the admissibility of this evidence—that it was improperly used to show defendant's bad character and propensity for violence—is legally unsound with respect to admissibility under MCL 768.27b. This statute "in certain instances expands the admissibility of domestic-violence other-acts evidence beyond the scope permitted by MRE 404(b)(1)." *People v Mack*, 493 Mich 1, 2; 825 NW2d 541 (2012). Unlike MRE 404(b)(1), "[t]he language of MCL 768.27b clearly indicates that trial courts have discretion to admit relevant evidence of other domestic assaults to prove any issue, *even the character of the accused*, if the evidence meets the standard of MRE 403." *People v Cameron*, 291 Mich App 599, 609; 806 NW2d 371 (2011) (quotation marks and citation omitted; emphasis added). "[P]rior-bad-acts evidence of domestic violence can be admitted at trial because a full and complete picture of a defendant's history . . . tend[s] to shed light on the likelihood that a given crime was committed." *Id.* at 610 (quotation marks and citation omitted; ellipsis and alteration in original).

Evidence that defendant had committed previous acts of domestic violence against Osborne tends to make it more likely that defendant would act violently toward another member of his family, including the child victim in this case, which would in turn make it more likely that he intentionally inflicted the child's injuries as opposed to those injuries having been caused by an accidental fall. Therefore, this evidence was relevant. See *People v Watkins*, 491 Mich 450, 470; 818 NW2d 296 (2012) ("[T]his Court has long recognized that a defendant's character and propensity to commit the charged offense is highly relevant because an individual with a substantial criminal history is more likely to have committed a crime than is an individual free of past criminal activity.") (quotation marks and citation omitted). The language in MCL 768.27b(1) making this type of evidence "admissible for any purpose for which it is relevant" thus clearly permits evidence of defendant's propensity to commit the charged crime. *Cameron*, 291 Mich App at 609; see also *Watkins*, 491 Mich at 470 (recognizing that similar language in MCL 768.27a "permits the use of evidence to show a defendant's character and propensity to commit the charged crime, precisely that which MRE 404(b) precludes").

Next, admissibility of this evidence was not barred by MRE 403. In the context of applying MRE 403 to the admissibility of evidence under MCL 768.27b, the propensity inference arising from the other-acts evidence is to be weighed in favor of the evidence's probative value rather than its prejudicial effect. See *Watkins*, 491 Mich at 487 (explaining how to apply MRE 403 in the context of MCL 768.27a, a statute analogous to MCL 768.27b but involving criminal cases where the defendant is accused of committing "a listed offense against a minor"). In this case, applying the approach set forth by our Supreme Court, the domestic violence other-acts evidence was highly probative. There also was nothing inappropriately inflammatory about the other-acts evidence that would have caused the jury to lose sight of the conduct for which defendant was actually on trial, and the trial court additionally instructed the jury with respect to the other-acts evidence that it was not to convict defendant for the charged offenses solely on the basis of other bad conduct. Thus, there was no danger of *unfair* prejudice—i.e., that marginally probative evidence would be given undue weight, *Crawford*, 458 Mich at 398, or that the jury would base its decision on extraneous considerations such as bias, sympathy, anger, or shock, *Cameron*, 291 Mich App at 611.

Therefore, the trial court did not abuse its discretion by admitting this evidence under MCL 768.27b. Because the evidence was admissible under MCL 768.27b, it is unnecessary for us to address the admissibility of this evidence under MRE 404(b). *People v Pattison*, 276 Mich App 613, 616; 741 NW2d 558 (2007). Defendant has not shown error requiring reversal with respect to the admission of evidence of prior acts of domestic violence.

## V. GENERAL INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Next, defendant argues that defense counsel was ineffective in additional ways not discussed above.

Our review of these issues is limited to the appellate record since there was no evidentiary hearing. *Sabin*, 242 Mich App at 659. "[E]stablishing ineffective assistance requires a defendant to show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *Randolph*, 502 Mich at 9, citing *Strickland*, 466 US at 688; *Pickens*, 446 Mich at 338.

First, defendant argues that defense counsel was ineffective by failing to call a medical expert to testify and rebut the testimony of the prosecution's three medical experts. Defendant also maintains that it was insufficient to only call an expert in biomedicine and biomedical engineering. Further, defendant contends that the particular expert obtained by defense counsel was inadequate due to a lack of experience testifying in court. "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). "A defendant must meet a heavy burden to overcome the presumption that counsel employed effective trial strategy," and the failure to call a witness can generally "constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense." *Id*. (quotation marks and citation omitted).

In this case, although defense counsel did not present an expert in medicine, defense counsel did call Jamison, a biomedical engineer to testify as an expert in the areas of biomechanics and biomedicine. Defense counsel presented Jamison as an expert witness to testify about how the child's injuries could be explained by the type of fall described by defendant through the application of mathematical and engineering principles. Furthermore, defense counsel thoroughly cross-examined each of the prosecution's experts and specifically elicited testimony about their respective lack of training in engineering and application of engineering principles to inform their analyses. It was clear that defense counsel's strategy was to show the jury that it was necessary to look to the field of engineering to explain the type of forces and actions that could have caused the child's injuries and whether an accidental fall could account for those injuries. In pursuit of this strategy, defense counsel attempted to show that the prosecution's experts lacked the requisite knowledge to opine about whether an accidental fall down the stairs could have caused the child's injuries. On appeal, defendant has not identified any medical expert who could have provided testimony that would have been helpful to the defense. Defendant also has not explained on appeal how the expert testimony of Jamison was harmful to the defense or, in particular, how the fact that this was Jamison's first time testifying in court had a negative impact on Jamison's ability to present his expert opinion.

In essence, defendant's appellate argument amounts to an attempt to propose an alternative strategy that he believes should have been pursued at trial. "There are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 US at 689. "We will not substitute our judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence." *Unger*, 278 Mich App at 242-243. "The fact that the strategy chosen by defense counsel did not work does not constitute ineffective assistance of counsel." *People v Williams*, 240 Mich App 316, 332; 614 NW2d 647 (2000). Defendant has thus failed to overcome the strong presumption that defense counsel employed sound trial strategy regarding the choice of expert witness in this case. Furthermore, defendant has also failed to advance any argument, beyond mere assertion, that coherently demonstrates that but for defense counsel's strategic choices on this matter, the outcome of the trial would have been different. Defendant has not demonstrated that he received ineffective assistance of counsel based on counsel's decision regarding the presentation of expert testimony. *Strickland*, 466 US at 700.

Next, defendant asserts that defense counsel was ineffective for (1) failing to present evidence "to oppose the false narrative" that defendant was "emotionless" following the incident that led to the child's death, (2) failing to present evidence to oppose the "false narrative" promoted by the prosecution that defendant was faking his medical condition related to fainting and seizures, and (3) failing to obtain and present his work records that would have shown that he was not the child's primary caretaker when the clavicle injury occurred. Defendant further advances a vague, conclusory argument that defense counsel was ineffective for failing to object to allegedly improper statements made by the prosecutor.

As an initial matter, defendant has not cited any legal authority to support his assertions that the above actions demonstrate that he received constitutionally ineffective assistance of counsel. These arguments are therefore abandoned. *Kelly*, 231 Mich App at 640-641. Moreover, even assuming that defense counsel had taken the above actions in accordance with defendant's expressed viewpoint on appeal,[18] defendant nonetheless has not demonstrated that but for these supposed failures, the outcome of his trial would have been different in light of the overwhelming evidence that the child's multiple recent and serious injuries could not be fully explained by an accidental fall down the stairs as claimed by defendant. Therefore, defendant has not demonstrated that defense counsel provided ineffective assistance on this basis. *Strickland*, 466 US at 700.

## VI. PROSECUTORIAL MISCONDUCT

---

[18] We note, however, that defendant did present evidence to support his contentions regarding his medical condition. We also note that there was no evidence from which it could be determined precisely when the clavicle was injured, so we do not see how defendant's work records would have established anything of value. Moreover, as discussed earlier in this opinion, there was no evidence that defendant caused the clavicle injury.

Next, defendant argues that the prosecutor made multiple improper remarks throughout trial constituting prosecutorial misconduct.

First, defendant argues that the prosecutor denigrated the defense in both opening statement and closing arguments. However, as defendant admits on appeal, there was no objection at trial to any of the statements now cited by defendant on appeal. Because a timely objection and appropriate curative instruction would have eliminated any prejudice from these statements, even if they constituted improper remarks, defendant is not entitled to relief based on these statements. *Unger*, 278 Mich App at 235. Moreover, considering that review of these unpreserved appellate challenges is for "outcome-determinative[] plain error," *id*., defendant has not provided any cogent rationale beyond mere assertions for how the allegedly improper statements affected the outcome of the trial in light of the overwhelming evidence of defendant's guilt.

Next, defendant argues that the prosecutor improperly suggested that defendant was "faking" with respect to his medical condition. However, this was a somewhat legitimate inference from the evidence presented through prosecution witnesses regarding their observations of defendant during times when he claimed he was having a syncopal episode or some form of seizure. Prosecutors "are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Id*. at 236. Defendant therefore has not shown that there was misconduct regarding this argument.

Defendant additionally argues that the prosecutor committed misconduct by asking a witness whether she purchased marijuana from defendant on the day of the incident, which defendant argues was intentionally designed to inflame the jury. At trial, defense counsel immediately objected to this question before the witness could answer, and a discussion was held outside the presence of the jury. The trial court sustained the objection. After the jury was brought back into the court room, the trial court instructed the jury that there was "no evidence whatsoever with respect to marijuana" and that the jury was to completely disregard the question. This curative instruction was sufficient to eliminate any prejudice caused by the prosecutor's improper remark. "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions." *Id*. at 235 (citation omitted). Accordingly, we do not believe that the remark at issue denied defendant a fair trial. *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999) (stating that the test for claims of prosecutorial misconduct is "whether defendant was denied a fair trial").

## VII. MOTION FOR A MISTRIAL

Finally, defendant argues that the trial court erred by not granting a mistrial after the prosecutor (1) elicited testimony from Osborne that she left defendant's name off the victim's birth certificate because he had outstanding warrants and (2) asked a witness whether defendant had sold her marijuana when she visited him earlier on the day that the child victim died. The trial court sustained defendant's objections in each of these instances, but denied defendant's accompanying motions for a mistrial.

-24-

This Court reviews a trial court's decision denying a motion for a mistrial for an abuse of discretion. *People v Dickinson*, 321 Mich App 1, 18; 909 NW2d 24 (2017). "An abuse of discretion occurs when the trial court chooses an outcome that is outside the range of principled outcomes." *Id*. "A mistrial is warranted only when an error or irregularity in the proceedings prejudices the defendant and impairs his ability to get a fair trial." *People v Waclawski*, 286 Mich App 634, 708; 780 NW2d 321 (2009) (quotation marks and citation omitted).

Defendant's appellate challenge in this case is based on two instances during trial where defendant moved for a mistrial. First, during Osborne's testimony, the following exchange occurred between the prosecutor and Osborne:

> *Q*. Now during the time period that you lived with your mother . . . Tell me what you relationship with the defendant was like?
>
> *A*. It wasn't very great. I had a lot of restrictions that I put on myself.
>
> *Q*. What kind of restrictions were you putting on yourself?
>
> *A*. I didn't put him on [the child's] birth certificate because he still had warrants at the time.

Defense counsel immediately objected, the jury was excused, and defense counsel moved for a mistrial. An extended discussion was held outside the presence of the jury, during which the prosecutor argued that Osborne's answer was nonresponsive to the question. The trial court denied defendant's motion for a mistrial and instructed the jury as follows once the jury returned to the courtroom:

> [Defense counsel] objected to the witness's last response. I have sustained that objection.
>
> The witness had said in response to a question by [the prosecutor], she didn't put him on the birth certificate because he still had warrants.
>
> I am striking that answer from the record. You are to disregard it, meaning you are to consider her testimony as if that statement has never been made. It is totally irrelevant to this proceeding.
>
> Moreover, this is a lay witness who would have no personal knowledge whatsoever with respect to whether or not the Defendant even had warrants. And warrants, the Court observes, could be something as mundane as unpaid parking tickets.
>
> So with that, totally disregard the statement.

Next, during the testimony of a different prosecution witness who was a friend of defendant's, the following exchange occurred between the prosecutor and the witness during questioning about the witness visiting defendant on the morning of June 24, 2016:

*Q.* What did you do?

*A.* I dropped off the car seat

*Q.* Did you smoke weed?

*A.* Not that I remember

*Q.* Did you pay him for any weed?

Defense counsel immediately objected, the jury was excused, and defense counsel again moved for a mistrial. A discussion outside the presence of the jury ensued, and the trial court stated:

> I mean, there is no question that that was an improper question, particularly without any foundation whatsoever as to that alleged event. I mean, the objection should be sustained.

The trial court denied defendant's motion for a mistrial and instructed the jury as follows upon its return to the courtroom:

> Ladies and gentlemen, I have sustained the objection to the question. "Did you pay for the marijuana."
>
> I will instruct you to disregard the question, and to the extent the witness answered or attempted to answer it, disregard her answer.
>
> At this juncture, there is no evidence whatsoever with respect to marijuana.
>
> So you are to disregard it as if it wasn't, as if you didn't hear it.

Both instances involved isolated comments that were addressed through sufficient curative instructions by the trial court. Defense counsel objected promptly, preventing these incidents from becoming more damaging. The court's curative instructions adequately made it clear to the jurors that they were not to consider the improper comments as evidence against defendant and, in the case of the marijuana comment, specifically noted that no evidence had actually been introduced that defendant had used marijuana in any event. Jurors are presumed to follow their instructions, and sufficient curative instructions can alleviate possible prejudice from isolated, improper comments such that a mistrial is not required. *Waclawski*, 286 Mich App at 709-710. We conclude in this case that because of the isolated nature of the improper comments and the adequacy of the curative instructions, defendant's ability to get a fair trial was not impaired. *Id.* at 708-710. The trial court did not abuse its discretion by denying defendant's motion for a mistrial.

Affirmed.

/s/ Stephen L. Borrello
/s/ Kirsten Frank Kelly
/s/ Deborah A. Servitto